FILED

2012 Jun-25  PM 02:28
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **AMANDA K. MERKLE,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | **5:11-cv-2263-AKK** |
| **MICHAEL J. ASTRUE,** | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY** | ) | |
| **ADMINISTRATION,** | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Amanda K. Merkle ("Merkle") brings this action pursuant to

sections 205(g) and 1631(c)(3) of the Social Security Act ("the Act"), 42 U.S.C.

§§ 405(g) and 1383(c)(3), seeking review of the final adverse decision of the

Commissioner of the Social Security Administration ("SSA").  Doc. 1.  This court

finds that the Administrative Law Judge's ("ALJ") decision - which has become

the decision of the Commissioner - is supported by substantial evidence.

Therefore, for the reasons elaborated herein, the Court will **AFFIRM** the decision

denying benefits.

# I.  Procedural History

Merkle filed her application for Title XVI Supplemental Security Income ("SSI") on February 20, 2008, and originally alleged a disability onset date of April 1, 2007, due to disorders of the back (discogenic and degenerative) and anxiety related disorders.  (R. 64).  Merkle subsequently amended her alleged disability onset date to February 20, 2008, the date of her SSI application.  (R. 91).  After the SSA denied her application on May 30, 2008, (R. 65-69), Merkle requested a hearing on June 19, 2008, (R. 72-74), which she received on December 22, 2009, (R. 39-62).  At the time of the hearing, Merkle was 37 years old with a seventh grade education.  (R. 41).  Her past relevant work included light to heavy unskilled work as a cashier/manager at fast food restaurants, mental health worker at a residential facility, chicken vaccinator at a poultry hatchery, and laundry folder at a uniform cleaning facility.  (R. 29).  Merkle has not engaged in substantial gainful activity since February 20, 2008.  (R. 19).

The ALJ denied Merkle's SSI claim on February 8, 2010, (R. 30), which became the final decision of the Commissioner when the Appeals Council refused to grant review on April 28, 2011, (R. 1-4).  Merkle then filed this action on June 24, 2011, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  Doc. 1.

## II.  Standard of Review

The only issues before this court are whether the record contains substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the ALJ applied the correct legal standards, *see Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Title 42 U.S.C. §§ 405(g) and 1383(c) mandate that the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'"  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is "reasonable and supported by substantial evidence."  *See id.*  (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Martin*, 849 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted).  If supported by substantial evidence, the court must affirm the Commissioner's factual findings even if the preponderance of the evidence is against the Commissioner's findings.

*See Martin*, 894 F.2d at 1529.  While the court acknowledges that judicial review of the ALJ's findings is limited in scope, it notes that the review "does not yield automatic affirmance."  *Lamb*, 847 F.2d at 701.

### III.  Statutory and Regulatory Framework

To qualify for disability benefits, a claimant must show "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 416(i); 42 U.S.C. § 423(d)(1)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3); *see also* 42 U.S.C. § 416(i)(1).

Determination of disability under the Act requires a five step analysis.  *See* 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f).  Specifically, the Commissioner must determine in sequence:

(1)    whether the claimant is currently unemployed;

(2)    whether the claimant has a severe impairment;

(3)    whether the impairment meets or equals one listed by the Secretary;

(4)     whether the claimant is unable to perform his or her past work; and

(5)     whether the claimant is unable to perform any work in the national economy.

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986). "An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of 'not disabled.'" *Id*. at 1030 (citing 20 C.F.R. § 416.920(a)-(f)). "Once a finding is made that a claimant cannot return to prior work the burden shifts to the Secretary to show other work the claimant can do." *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995) (citation omitted).

Lastly, where, as here, a plaintiff alleges disability because of pain, she must meet additional criteria. In this circuit, "a three part 'pain standard' [is applied] when a claimant seeks to establish disability through his or her own testimony of pain or other subjective symptoms." *Holt v. Barnhart*, 921 F.2d 1221, 1223 (11th Cir. 1991). Specifically,

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.[1]

---

[1] This standard is referred to as the *Hand* standard, named after *Hand v. Heckler*, 761 F.2d 1545, 1548 (11th Cir. 1985).

*Id*.  However, medical evidence of pain itself, or of its intensity, is not required:

> While both the regulations and the *Hand* standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, <u>neither requires objective proof of the pain itself</u>.  Thus under both the regulations and the first (objectively identifiable condition) and third (reasonably expected to cause pain alleged) parts of the *Hand* standard <u>a claimant who can show that his condition could reasonably be expected to give rise to the pain he alleges has established a claim of disability and is not required to produce additional, objective proof of the pain itself</u>.  *See* 20 CFR §§ 404.1529 and 416.929; *Hale* [*v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)].

*Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1215 (11th Cir. 1991) (parenthetical information omitted) (emphasis added).  Moreover, "[a] claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability." *Holt*, 921 F.2d at 1223.  Therefore, if a claimant testifies to disabling pain and satisfies the three part pain standard, the ALJ must find a disability unless the ALJ properly discredits the claimant's testimony.

Furthermore, when the ALJ fails to credit a claimant's pain testimony, the ALJ must articulate reasons for that decision:

> It is established in this circuit that if the [ALJ] fails to articulate reasons for refusing to credit a claimant's subjective pain testimony, then the [ALJ], as a matter of law, has accepted that testimony as true.  Implicit in this rule is the requirement that such articulation of reasons by the [ALJ] be supported by substantial evidence.

*Hale*, 831 F.2d at 1012.  As such, if the ALJ either fails to articulate reasons for refusing to credit the plaintiff's pain testimony, or if the ALJ's reasons are not supported by substantial evidence, the court must accept as true the pain testimony of the plaintiff and render a finding of disability.  *Id*.

## IV.  The ALJ's Decision

The court turns now to the ALJ's decision to ascertain whether Merkle is correct that the ALJ committed reversible error.  In that regard, the court notes that, performing the five step analysis, the ALJ initially determined that Merkle had not engaged in substantial gainful activity since her alleged onset date, and therefore met Step One.  (R. 19).  Next, the ALJ found that Merkle suffers from the following severe impairments: "low back pain with early spondylosis of thoracic and lumbar spine and spina bifida occulta at S1, sacroilitis, degenerative joint disease of the right hip, and obesity," *id.*, but that Merkle's edema, headaches, fibromyalgia, osteoporosis, medication side effects, and alleged mental impairments are not severe impairments, (R. 19-23).  The ALJ then proceeded to the next step and found that Merkle failed to satisfy Step Three because she "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments."  (R. 18).  Although the ALJ answered Step Three in the negative, consistent with the law, *see McDaniel*, 800 F.2d at 1030, the

ALJ proceeded to Step Four, where he determined that "claimant has the residual

functional capacity ['RFC'] to perform the full range of sedentary work as defined

in 20 CFR 416.967(a)."  (R. 23).  Moreover, in light of Merkle's RFC, the ALJ

held that Merkle is "unable to perform any past relevant work."  (R. 29).  Lastly, in

Step Five, the ALJ considered Merkle's age, education, work experience, and

RFC, and determined—based exclusively on the Medical Vocational Guidelines

found in 20 C.F.R. Part 404, Subpart P, Appendix 2, section 201.24—that "there

are jobs that exist in significant numbers in the national economy that the claimant

can perform."  (R. 30).  Because the ALJ answered Step Five in the negative, the

ALJ determined that Merkle "has not been under a disability, as defined in the

Social Security Act, from February 20, 2008 through the date of this decision."  *Id.*

*See also McDaniel*, 800 F.2d at 1030.

## V.  Analysis

The court turns now to Merkle's contention of error that "[b]y finding no

severe mental impairment and a capacity for a full range of sedentary work, and

directly applying [the Medical Vocational Rules or the 'Grids'], the ALJ

circumvented the need to identify specific and available jobs in establishing that

Plaintiff is capable of other than past work."  Doc. 9, at 5.  Stated differently,

Merkle contends that the ALJ erroneously utilized the Grids, as opposed to a

Vocational Expert ("VE"), in performing Step Five because she suffers from a "severe" mental impairment and her obesity and pain prevent performance of the *full range* of sedentary work. *Id.* at 5-8. The court disagrees and finds the ALJ's decision supported by substantial evidence.

In finding that Merkle can perform jobs that exist in the national economy, the ALJ utilized the Grids found in 20 C.F.R. Part 404, Subpart P, Appendix 2, rather than employ the services of a VE. (R. 19-30). *See also* 20 C.F.R. § 416.969. The agency regulations provide that "when all factors coincide with the criteria of a [Grid] rule, the existence of such jobs is established. However, the existence of such jobs for individuals whose remaining functional capacity or other factors do not coincide with the criteria of a [Grid] rule must be further considered in terms of what kinds of jobs or types of work may be either additionally indicated or precluded." 20 C.F.R. Part 404, Subpart P, Appendix 2, section 200.00(b). In other words, where, as here, "the claimant has established that she cannot return to her past relevant work, the burden shifts to the Secretary to prove that the claimant is capable, considering her age, education, and work experience, of engaging in any other kind of employment. At this stage, the Medical Vocational Guidelines, 20 C.F.R. pt. 404, subpt. P, app. II (the grids), may come into play." *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987).

And indeed, "[t]he grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation." *Id.* at 1003.

The ALJ found that Merkle squarely met the requirements for Grid section 201.24.  (R. 30).  This Grid provides that if (a) the claimant's "maximum sustained work capability [is] limited to sedentary work as a result of severe medically determinable impairment(s);" (b) the claimant is between the age of 18-44; (c) the claimant is at least literate and able to communicate in English; and (d) the claimant has either unskilled or no previous work experience, then the claimant is not disabled.  20 C.F.R. Part 404, Subpart P, Appendix 2, section 201.24.

Conversely, "'[e]xclusive reliance on the grids is not appropriate either when claimant is [1] unable to perform a full range of work at a given functional level or [2] when a claimant has non-exertional impairments that significantly limit basic work skills.'"  *Id.* at 1002-03 (quoting *Francis v. Heckler*, 749 F.2d 1562, 1566 (11th Cir. 1985)).  For "exertional" impairments, the claimant must be able to do "'unlimited' types of work at the given exertional level." *Phillips v. Barnhart*, 357 F.3d 1232, 1242 (11th Cir. 2004).  Thus, for the "sedentary" exertional level:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which

> involves sitting, a certain amount of walking and standing is often
> necessary in carrying out job duties. Jobs are sedentary if walking and
> standing are required occasionally and other sedentary criteria are
> met.

20 C.F.R. § 416.967(a).  *See also Walker*, 826 F.2d at 1000.  To properly utilize a

Grid level that contains a sedentary work RFC, "the ALJ must determine whether

[claimant] can perform a full range or unlimited types of work at the sedentary

level given her exertional limitations."  *Phillips*, 357 F.3d at 1242.

As it relates to any nonexertional limitations, "the ALJ need only determine

whether [the claimant's] nonexertional impairments significantly limit her basic

work skills."  *Id.* at 1243.  For purposes of the Grids, the Eleventh Circuit "has

interpreted 'significantly limit basic work skills' as limitations that prohibit a

claimant from performing 'a wide range' of work at a given work level."  *Id.*

(citing *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995)).  In sum, "[i]f the

ALJ determines that [the claimant's] nonexertional limitations do not significantly

limit her basic work skills at the sedentary work level, then the ALJ may rely on

the grids to determine if [the claimant] is disabled.  If, however, the ALJ

determines that [the claimant's] nonexertional limitations significantly limit her

basic work skills at the sedentary level, then the ALJ must consult a vocational

expert."  *Id.*

Merkle argues that her mental impairments, obesity, and pain foreclose use of Grid section 201.24 because these impairments prohibit the performance of a wide and/or full range of sedentary work.  The court addresses each impairment in turn.

A.    *Mental Impairments*

The ALJ found that, for Step Two of the sequential process, Merkle's mental impairments failed to rise to the level of *severe* impairments.  Specifically, Merkle's "course of treatment does not suggest the presence of any symptoms or limitations that would more than minimally interfere with her ability to engage in work-related activities."  (R. 22).  The ALJ further determined that Merkle's mental impairments "have resulted in no more than a mild restriction of daily living activities, mild difficulty with maintaining social functioning, and mild difficulty with maintaining concentration, persistence and pace. [Merkle] has experienced no episodes of decompensation which have been of extended duration."  (R. 23).  To ascertain the severity of a mental impairment, the agency regulations establish that the ALJ must assess four functional limitation criteria: "Activities of daily living; social functioning; concentration, persistence, or pace;

and episodes of decompensation." 20 C.F.R. § 404.1520a.[2]  The regulations

further provide that, in some circumstances, these functional limitations may not

rise to the level of a "severe" impairment for purposes of Step Two in the

sequential process.  *See* 20 C.F.R. § 404.1520a-(d)(1) ("If we rate the degree of

your limitation in the first three functional areas as 'none' or 'mild' and 'none' in

the fourth area, we will generally conclude that your impairment(s) is not severe,

unless the evidence otherwise indicates that there is more than a minimal

limitation in your ability to do basic work activities."); 20 C.F.R. § 404.1521;

*Moore v. Barnhart*, 405 F.3d 1208, 1213-14 (11th Cir. 2005).  Substantial

evidence supports the ALJ's finding for Merkle's purported mental impairments.

The medical evidence regarding Merkle's mental impairments consists of a

May 29, 2008 Mental Examination by Barry Wood, Ph. D., (R. 256-259), and the

Psychiatric Review Technique by Dr. Robert Estock, (R. 265-278).  Dr. Wood

provided in the psychiatric/behavioral history section that "claimant reported she

first received psychiatric treatment during her early 20's.  At that time she was

prescribed Xanax by a family physician to address generalized anxiety and panic

---

[2] "When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more."  20 C.F.R. § 404.1520a-(c)(4).

episodes . . . . She next received psychiatric treatment during the late 1990's.  At that time she was prescribed Xanax again to address a severe gastric ulcer she characterized as stress-related.  She reported she continued to take Xanax since that time with good effect . . . . She denied any history of psychotropic-medication use beyond that detailed above."  (R. 257).  Furthermore, Dr. Wood stated that Merkle "reported she visited the ER for panic on perhaps 15-20 occasions.  In fact, she reported that she was forced to visit Decatur General Hospital to address panic on the night prior to the interview."  *Id.*

For "mental status," Dr. Wood provided that Merkle "was oriented x3.  Her affect was constricted, but it became euthymic during unguarded moments.  Her mood appeared to be more dysphoric than anxious, but it also improved during unguarded moments.  Significant dramatic flair and even greater passive aggression were evident throughout the interview.  Her short-term memory appeared to be intact as evidence by her ability to identify details of events from the day prior to the interview.  Her long term memory appeared to fall within normal limits as evidenced by her recitation of history."  (R. 258).  Finally, Dr. Wood concluded that Merkle's "generalized anxiety appears to be largely controlled with medication, and her panic episodes are partially controlled.  The probability that she also struggles with personalogic deficits is high."  *Id.*  As

such, "[t]he examiner believes the claimant is able to understand instructions,
recall instructions, and execute the instructions *to the extent allowed by her
physical status*.  The examiner believes her mood symptoms and likely
personalogic symptoms *affect-but-do-not-preclude* her ability to interact with
supervisors, coworkers, and customers."  (R. 259) (emphasis added).  Therefore,
Dr. Wood diagnosed Merkle with Panic Disorder without Agoraphobia (in partial
remission with medication), Generalized Anxiety Disorder (in remission), and
Personality Disorder NOS with Features of Negativistic (passive-aggressive)
Personality Disorder (provisional).  Dr. Wood also gave Merkle a Global
Assessment of Functioning ("GAF") score of 67.  *Id.*

Similarly, Dr. Robert Estock found that Merkle suffered from "not severe"
mental impairments after reviewing Dr. Wood's Mental Examination and the other
medical evidence of record.  (R. 277).  Specifically, Dr. Estock concluded that
Merkle's mental impairments created a mild limitation on activities of daily living,
a mild limitation in social functioning, and a mild limitation in maintaining
concentration, persistence, or pace.  Dr. Estock also found that Merkle suffered
from no episodes of decompensation.  (R. 275).

Furthermore, Merkle's extensive emergency room records fail to
corroborate the assertion that she sought aggressive treatment for mental

impairments.  (R. 153-248, 279-294, 297-386).  While Merkle claimed a past

medical history of anxiety for certain emergency room visits, the emergency room

records only reveal two instances of contemporaneous anxiety complaints—a

January 30, 2008 visit to the emergency room for an insect bite where Merkle

claimed anxiety, (R. 164-165), and a December 14, 2008 presentation to the

emergency room for anxiety because she was "scared to take medicine," (R. 379-

384).  Finally, Dr. Edwin K. Matthews diagnosed Merkle with anxiety disorder

NOS, (R. 395), but Dr. Matthews' medical records offer no indication of treatment

for this mental impairment besides the Xanax prescription, and no indication of

limiting effects on Merkle's daily activities, (R. 395).  Indeed, in most treatment

notes from Dr. Mark A. Murphy, Merkle's treating pain management physician, he

considers the Xanax "effective" and without side effects.  (R. 399-459, 467-558).

Dr. Murphy also provided no indication of any mental impairments, let alone

severe mental impairments.  *Id.*

Thus, the objective medical evidence reveals that Merkle takes Xanax for

anxiety, but has received no more than minimal and conservative mental health

treatment or hospitalization for mental impairments.  Moreover, two medical

experts found only mild mental impairments.  As such, the ALJ's finding of "non-

severe" mental impairments is supported by substantial evidence.  Moreover, by

finding only "non-severe" mental impairments, the ALJ concluded that Merkle's

mental impairments caused no more than minimal limitations on the ability to

engage in work related activities.  (R. 22).  This finding corresponds with the

Grids analysis regarding nonexertional limitations.  *See Phillips*, 357 F.3d at 1242.

In other words, as Merkle's mental impairments create no more than *minimal*

limitations on work related activities, she can still perform a "wide range" of

sedentary work.  *Id.*  ("If the ALJ determines that [the claimant's] nonexertional

limitations do not significantly limit her basic work skills at the sedentary work

level, then the ALJ may rely on the grids to determine if [the claimant] is

disabled.").

B.     *Obesity*

Merkle also contends that the ALJ erred by failing to factor her obesity into

the sedentary work RFC.  Doc. 9, at 7.  Generally, where, as here, the ALJ finds

that a claimant's obesity is a medically determinable impairment, (R. 19), the ALJ

should consider any functional limitations resulting from the obesity in the RFC

assessment.  SSR 02-1p, 2002 WL 34686281, at *7 (S.S.R. Sept. 12, 2002).

However, a claimant must still "specify how [*her*] obesity further impaired [*her*]

ability to work [rather than] speculate[] merely that [her] weight makes it more

difficult to stand and walk."  *Skarbek v. Barnhart*, 105 F. App'x 836, 840 (7th Cir.

2004).  Thus, while Merkle correctly establishes that "SSR 02-1p recognizes that obesity can cause limitations in all exertional and postural functions; that it can affect an individual's ability to sustain routine movement and work activity," doc. 9, at 7, the ALJ also correctly concluded that "the record reveals that no physician treating [Merkle] reported that [Merkle's] weight significantly limited her or caused her any problems with musculoskeletal impairments," (R. 25-26).  At the ALJ hearing Merkle maintained that her doctors "wanted [her] to start trying to walk two miles" per day for exercise.  (R. 50).  However, other than this recommendation, the medical evidence offers no other mention of functional impairments due to obesity.  As such, substantial evidence supports the ALJ's decision that Merkle can perform the "full range or unlimited types of work at the sedentary level" even though she suffers from obesity.  *See Phillips*, 357 F.3d at 1242.

## C.    *Pain*

Finally, Merkle argues, without analysis, that the ALJ erred because he "avoided factoring in any assessment of pain level in his blanket RFC finding for sedentary work."  Doc. 9, at 7.  The court again disagrees.  The ALJ determined that, while Merkle suffers from the severe impairments of "low back pain with early spondylosis of thoracic and lumbar spine and spina bifida occulta at S1,

sacroilitis, degenerative joint disease of the right hip, and obesity," (R. 19),

Merkle's "statements concerning the intensity, persistence, and limiting effects of

these symptoms are not credible to the extent they are inconsistent" with the

ability to perform a wide range of work at the sedentary level. *See Phillips*, 357

F.3d at 1242 n.11 (listing pain limitations as nonexertional limitations).

Substantial evidence supports this conclusion because Merkle's "objectively

determined medical condition is [not] of such a severity that it can be reasonably

expected to give rise to the alleged pain."   *Holt*, 921 F.2d at 1223.

First, Merkle's purported daily activities are consistent with an ability to

perform a wide range of sedentary work.  Merkle testified that she walks a block

to her daughter's house two or three times a week, (R. 50), and is able to stand for

an hour and sit for an hour, (R. 57).  Merkle is the primary care giver for her nine

year old niece and prepares easy meals and shops for personal needs on a monthly

basis.  (R. 44, 109).  Merkle is able to independently care for her personal needs

such as bathing, grooming, and dressing, and she also performs household chores,

watches television, talks with friends on the telephone, and reads the newspaper.

(R. 108-110).  Moreover, in the Disability Examination, Dr. Marlin Gill provided

that Merkle's "[g]ait is normal.  She walks unassisted and uses no devices.  Upper

extremities appear normal and symmetrical.  She complains of pain with shoulder

movement but otherwise uses the extremities well." (R. 253). While noting that Merkle "gives questionable effort for this portion of the exam," Dr. Gill also provided that Merkle "jumps and complains of pain with light fingertip touch anywhere over the lumbar spine. She complains of pain with any lumbar movement." *Id.*

However, Merkle's medical records indicate only objectively minor spine-related issues. On June 14, 2007, Dr. Malcolm H. Weathers performed a six view lumbar spine x-ray and found "no evidence of fracture or subluxation. Some degenerative changes of the lumbar and lower thoracic spine noted." (R. 198). Similarly, on February 21, 2008, Dr. Weathers performed another six view lumbar spine x-ray and found "mild degenerative changes. There is no evidence of fracture, subluxation or destructive lesions." (R. 155). Dr. Frank P. Scalfano performed a five view lumbosacral spine series with obliques on January 6, 2007 and determined that Merkle's "pedicles are intact. There is no evidence of acute fracture or subluxation. No acute disease." (R. 215). Moreover, after a whole body scan by Dr. Weathers on September 6, 2006, Merkle presented "no abnormal spinal activity . . . . There is no evidence of abnormal activity to correspond with the L3 vertebral body lesion on the 8/28/06 MRI." (R. 227). Furthermore, the August 7, 2006 lumbar spine x-ray by Dr. G.L. South revealed that Merkle's

"alignment appears within normal limits.  The disc spaces appear maintained.  No bony abnormality noted," (R. 239), and the August 26, 2007 exam by Dr. Jere Michael Disney revealed a "mild scoliosis of the thoracic spine.  No disc space narrowings, subluxations, or acute fractures . . . . There is some early spondylosis noted . . . . The examination of the lumbar spine reveals no disc space narrowings, subluxations, or acute fractures.  A spina bifida occulta is noted at S1.  There is some early spondylosis noted.  Some mild bilateral sacroilitis is noted."  (R. 460).  Finally, on December 15, 2009, Merkle received a lumbar MRI, and Dr. Thomas G. Harrell found: "Lower thoracic cord and conus are normal.  There is benign intraosseous hemangioma at the L3 level.  It measures approximately 10 mm.  The vertebrae are otherwise negative . . . . No evidence of herniation or nerve root abnormality."  (R. 512-514).

In addition to the spine testings performed at the Decatur Hospital emergency room, Dr. Murphy's treatment notes demonstrate that Merkle's pain was well-managed and under control.  Namely, Dr. Murphy's notes provide that, after treatment, Merkle suffered from little if any pain.  *See* (R. 399, 404, 409, 414, 419, 423, 427, 431, 437, 441, 448, 467, 469, 473, 477, 482, 486, 490, 494, 498, 503, 507, 515, 517, 521, 525, 529, 533, 537, 541, 545, 549, 553).  And indeed, Dr. Murphy maintained without exception that Merkle tolerated the pain medication

and pain management well with no side effects.  *Id.*  In fact, Dr. Murphy's records offer no opinion that Merkle's pain affected her daily activities or ability to perform work-related activities.  *Id.*  Accordingly, the objective medical evidence supports the ALJ's statement that Merkle's "pain was well controlled with only the same oral medications and no special intervention, referral to any specialists, or mention of change in regimen, any deterioration or worsening of her condition, or any surgical intervention."  (R. 26).

In sum, the ALJ exhaustively considered Merkle's numerous subjective pain complaints and found the severity of these allegations not credible based on the objective medical evidence and activities Merkle performs on a daily basis. Accordingly, the ALJ adequately considered, and ultimately rejected, the contention that Merkle's pain prevents her from performing a wide range of sedentary work.  Thus, substantial evidence supports the sedentary work RFC and the ALJ's corresponding reliance on Grid section 201.24 to find Merkle not disabled.

## VI.  Conclusion

Based on the foregoing, the court concludes that the ALJ's determination that Merkle is not disabled is supported by substantial evidence, and that the ALJ applied proper legal standards in reaching this determination.  Therefore, the

Commissioner's final decision is **AFFIRMED**.  A separate order in accordance with the memorandum of decision will be entered.

Done the 25th day of June, 2012.

_____

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE